TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922 Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

May 24, 2019

Michael A. Paff, Esq.
Paff Law Firm
P.O. Box 6767
495 N. Bridge Street
Bridgewater, New Jersey 08807

Robert F. Renaud, Esq.
Renaud DeAppolonio, LLC
190 North Avenue East
Cranford, New Jersey 07016

> Re:   Sandberg Enterprises, Inc. v. Fanwood Borough
>        Docket Nos. 013488-2014, 008849-2015, and 009785-2016

Dear Mr. Paff and Mr. Renaud:

This letter constitutes the court's opinion following trial of the local property tax appeals instituted by plaintiff, Sandberg Enterprises, Inc. ("Sandberg"). Sandberg challenges the 2014, 2015, and 2016 local property tax assessments on its improved property located in Fanwood Borough ("Fanwood").

For the reasons stated below, the court affirms the 2014, 2015, and 2016 local property tax assessments.

## I.   Procedural History and Findings of Fact

Pursuant to R. 1:7-4(a), the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

As of the valuation dates, Sandberg was the owner of the real property and improvements located at 2 South Avenue/N.J. State Highway 28, Fanwood, Union, County, New Jersey (the "subject property"). The subject property is identified on Fanwood's municipal tax map as Block 56, Lot 1.

The subject property is located at the intersection of South Avenue/N.J. State Highway 28 ("South Avenue") and Terrill Road. The site comprises a 1.81-acre flag shaped corner parcel with frontage along South Avenue, Terrill Road, and La Grande Avenue.[1] The subject property is located in close proximity to the border of Fanwood Borough, the City of Plainfield, and the Township of Scotch Plains. The real property is improved with an automobile service station, automotive repair facility, and mini-mart. Although the subject property comprises one lot, it is divided into two distinct parts: a 1.41 acre segment, fronting on the corner of Terrill Road and South Avenue, consisting of the automobile service station, automotive repair facility, and mini-mart; and an unimproved grass covered, 0.40 acre segment, located along the subject property's south-eastern boundary, fronting on the corner of Terrill Road and La Grande Avenue.

The automobile service station is comprised of 5 dual sided gasoline dispensers, divided into four islands (two parallel sets of two), one of which contains a 4' x 6' metal kiosk/attendant booth, covered by a 3,960 square foot canopy. The subject property contains underground storage tanks, a coin operated air compressor, and a coin operated vacuum.[2] The automotive repair facility and mini-mart are located in a 1-story brick and masonry structure, built in 1972, consisting of approximately 5,747 square feet. Approximately 945 square feet of the structure is

---

[1] Although the subject property contains frontage along La Grande Avenue, no vehicular access is afforded along La Grande Avenue.

[2] Sandberg's expert stated that the subject property contained three underground storage tanks. Fanwood's expert stated that the subject property contained four underground storage tanks.

devoted to the mini-mart, and the remaining 4,802 square feet is devoted to the automotive repair facility. The automotive repair facility is comprised of 5 drive-through bays (10 total bays), containing 10' x 10' glass and metal overhead doors, 2 lavatories, and automobile lifts, along with other personal property. The site contains an asphalt paved parking area of approximately 35,000 square feet. As of the trial date, ground water monitoring wells were installed on the subject property, and there was ongoing monitoring and/or remediation apparently being funded by the subject property's former owner. The subject property is located in the X Flood Hazard Zone, denoting an area of minimal flooding risk.

During the 2014 and 2015 years the subject property was located in two different zoning districts: (i) the automobile service station, automotive repair facility, and mini-mart were located in the LI - light industrial zoning district, with permitted uses that included industrial uses, warehouses, automobile service stations, automotive repair facilities, and conditional uses that included banks, retail sales, restaurants, and professional offices; and (ii) the grass covered segment, was located in the R-75 residential zoning district, with permitted uses that included single-family dwellings, public parks, and playgrounds.[3]

However, for the 2016 year the subject property's zoning district changed. Following the zoning change, the subject property was located in the CC-W - commercial corridor western zoning district, with permitted uses that include retail and convenience stores, personal service establishments, grocery stores, wine/liquor shops, restaurants/cafes, bars/taverns lounges, etc. Thus, the use of the site as an automobile service station, automotive repair facility, and mini-mart became a legal, non-conforming, pre-existing use.

---

[3] The subject property's deed to Sandberg apparently contained a restriction, prohibiting use of the subject property for any residential uses.

Sandberg timely filed complaints with the Tax Court challenging the subject property's 2014, 2015, and 2016 local property tax assessments. The matters were tried to conclusion over several days.

During trial, Sandberg and Fanwood each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the field of real property valuation (the "expert" or "experts"). Each expert prepared an appraisal report expressing an opinion of the true market value of the subject property as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates.

As of each valuation date, the subject property's tax assessment, implied equalized value, and each expert's value conclusion is set forth below:

| Valuation date | Tax assessment | Avg. ratio assessed to true value | Implied equalized value | Sandberg's expert | Fanwood's expert |
|---|---|---|---|---|---|
| 10/1/2013 | $393,800 | 20.95% | $1,879,714 | $1,350,000 | $2,065,000 |
| 10/1/2014 | $393,800 | 20.93% | $1,881,510 | $1,365,000 | $2,110,000 |
| 10/1/2015 | $393,800 | 19.97% | $1,971,958 | $1,375,000 | $2,450,000 |

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and

certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of Sandberg's proofs, Fanwood moved to dismiss these matters under R. 4:37-2(b), arguing that the presumption of validity that attaches to the local property tax assessments had not been overcome.[4] The court denied the motion and placed a statement of

---

[4] Fanwood argued, in part, that Sandberg's expert's analysis was flawed because: (i) in considering the subject property's highest and best use as vacant, Sandberg's expert concluded that it could be used for any legally permitted use, without clearly delineating the subject property's maximally productive use; (ii) under Sandberg's expert's cost approach, none of the vacant land sales permitted operation of an automobile service station or automobile repair facility and thus, must be stricken as not comparable to the subject property; and (iii) under Sandberg's expert's sales comparison approach, none of the improved sales were comparable to

5

reasons on the record. Without reciting at length herein those findings and conclusions, the court found that it must accord Sandberg all reasonable and legitimate inferences which can be deduced from the evidence presented. If accepted as true, the opinions of value offered by Sandberg's expert raised debatable questions regarding the correctness of the subject property's local property tax assessments, requiring denial of the motion.

Nonetheless, concluding that the presumption of validity has been overcome does not equate to a finding that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15.

B. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App.

the subject property in terms of property size, did not offer gasoline service, or were purchased and converted to another use.

6

Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)).

Although the experts considered all three valuation methods, both experts agreed that the replacement cost approach was the most appropriate method to derive a value for the subject property. However, in support of the replacement cost approach, Sandberg's expert relied on the sales comparison approach, and Fanwood's expert relied on the income capitalization approach.[5]

### 1. Cost approach

The cost approach derives a property's value "by adding the estimated value of the land to the current costs of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (i.e., deterioration and obsolescence) in the structures from all causes." The Appraisal of Real Estate, at 47. Thus, the cost approach consists of "two elements - land value and the reproduction or replacement cost of the buildings and other improvements." International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 417 (Tax 2004).

Under the cost approach, it is incumbent upon the appraiser to develop the land value and the replacement cost of the buildings and other improvements separately, because "[l]and value and building value may change at different rates. . . ." The Appraisal of Real Estate, at 43. In

---

[5] Although Fanwood's expert's report included a sales comparison approach, in his opinion, it "is not applicable as a main method of valuation for the subject property" due to its unique physical characteristics. Thus, Fanwood's expert did not rely on the sales comparison approach in deriving his conclusion of value for the subject property. Fanwood's expert further expressed that the subject property contains "surplus land, meaning it cannot be subdivided, but can be developed further. . . ."

order to derive a land value the appraiser may elect to use the sales comparison, extraction, land residual value, or allocation methods.  Id. at 44.  However, when adequate sales data and information is available, generally "the most reliable way to estimate land value is by sales comparison."  Ibid.  Using this method, an appraiser compares the subject property to comparable and competitive properties, applies adjustments derived from the marketplace for units of comparison, such as property rights conveyed, financing terms, condition, location, physical characteristics, and legal characteristics, in order to determine an estimate of value.  When sufficient recent and credible transactions are available, evidencing "value patterns and trends in the market," the sales comparison method can be a reliable indicator of market value.  Greenblatt, 26 N.J. Tax at 53.  Thus, a fundamental predicate of the sales comparison approach requires that evidence "is based on 'sound theory and objective data,' rather than on mere wishful thinking."  MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 699 N.E.2d 893, 897 (1998)).  Hence, the probative value of the comparative analysis hinges on the similarities which can be drawn and the objective market data utilized to support adjustments thereto.

At the outset, the court highlights that the experts' conclusions of value for the subject property's building and improvements under the replacement cost approach were not altogether disparate.  Sandberg's expert concluded a replacement cost new of the building and site improvements of: (1) $958,797, as of the October 1, 2013 valuation date; (2) $995,729, as of the October 1, 2014 valuation date; and (3) $1,011,247, as of the October 1, 2015 valuation date.  Conversely, Fanwood's expert concluded a replacement cost new of the building and site

improvements of: (1) $797,445, as of the October 1, 2013 valuation date; (2) $802,798, as of the October 1, 2014 valuation date; and (3) $770,341, as of the October 1, 2015 valuation date.[6]

However, a significant disparity exists between the experts with their conclusions of the subject property's land value. Sandberg's expert concluded a vacant land value of $200,000 per acre, and total land value of $360,000, as of each valuation date. Conversely, Fanwood's expert concluded a vacant land value of $800,000 to $1,205,000 per acre, and a total land value of $1,450,000 to $1,855,000, as of each valuation date.

a.  Highest and best use - vacant land sales

For the 2014 and 2015 tax years, Sandberg's expert identified four vacant land sales he considered reflective of the subject property's land value, and Fanwood's expert identified seven vacant land sales he considered reflective of the subject property's land value.[7]

The court begins its analysis of the experts' vacant land sales by emphasizing that, with one exception, all of the vacant land sale transactions had a highest and best use different than the subject property's highest and best use.

"The highest and best use of a competitive site on the date of sale is the basis of the comparability of that site to the property being appraised. Regardless of how physically similar a potentially comparable site is to the subject site, the sale property is not truly comparable if it

---

[6] The experts disagreed on how entrepreneurial profit should be applied. Sandberg's expert applied a 10% entrepreneurial profit to the replacement cost new of the building and improvements after depreciation. Conversely, Fanwood's expert applied a 10% entrepreneurial profit to the replacement cost new of the building and improvements before depreciation.

[7] For the 2016 year, Sandberg's expert relied on the same four vacant land sales to discern a value estimate for the subject property's land. Fanwood's expert identified a total of ten vacant land sales, however, only seven were relied on to discern a value estimate for the subject property's land for the 2014 and 2015 tax years. For the 2016 year, Fanwood's expert relied on one of the seven vacant land sales and three additional vacant land sales to discern a value estimate for the subject property's land.

does not have a similar highest and best use as the subject property. . . ." The Appraisal of Real Estate, at 362-363 (emphasis added). Thus, a property should be comparable not only as to "the physical characteristics but also includes their economic aspects, e.g., highest and best use." Ford Motor Co., 10 N.J. Tax at 170.

It is not an appropriate measurement of value to compare "the sale price paid by a purchaser who must adapt the property to the use that he intends to make of it with the value of a property that does not require such adaptation." Thomas J. Lipton, Inc. v. Raritan Twp., 10 N.J. Tax 202, 209 (Tax 1988), aff'd, 11 N.J. Tax 100 (App. Div. 1989). Comparable vacant land sales must be "properties sold for the same or similar use without the necessity of substantial physical changes." Id. at 210. See also Jersey City, Div. of Water v. Parsippany-Troy Hills Twp., 16 N.J. Tax 504, 519 (Tax 1997) (holding that "[h]ighest and best use is a function of the market" and "land having a highest and best use which is higher on the scale of uses than a particular buyer's intended use would not be sold to that buyer" because its price would be unacceptably too high for that buyer), aff'd, 17 N.J. Tax 538 (App. Div. 1998).

As eloquently expressed by Judge Andrew, it is not credible to "estimate the value of say, a gasoline station, by sales of gasoline station properties that were converted to another use either at the time of sale or shortly thereafter. The sale price in those instances would not be indicative of the value of a gasoline service station but rather of its value for some alternative use." Ford Motor Co., 10 N.J. Tax at 171.

In Sandberg's expert opinion, the highest and best use of the subject property, as vacant, was "[d]eveloping the land with a light industrial or commercial property, to the maximum density permitted by zoning . . . in a light industrial zoning district . . . ." Sandberg's expert further concluded that the highest and best use of the subject property, as improved, was as a

"gasoline service station." According to Sandberg's expert, this use was "an operating economic benefit, and . . . as improved, was the best use . . . for the site." Significantly however, Sandberg's expert did not express which of these two distinct uses, would generate the maximally productive use of the subject property.

Fanwood's expert's report stated that "the highest and best use of the subject site 'as improved' and 'as vacant' would be for the current use" as an automobile service station and automotive repair facility. However, during direct examination, and seemingly as a result of the arguments advanced by Fanwood's counsel during his R. 4:37-2(b) motion, Fanwood's expert attempted to reshape his highest and best conclusion, opining that the highest and best use of the subject property, as vacant, and, as improved, was as an automobile service station and automotive repair facility, or "any other type of high-end commercial use."[8] Thus, according to Fanwood's expert, he relied on vacant commercial land sales "in Union County. . . and then a little further out for other sites that were either used as a gas station, or could be used as a gas station, or some type of similar use."

Nonetheless, as set forth above, both Sandberg's expert and Fanwood's expert offered their opinions of the subject property's value computing the replacement cost of the existing automobile service station and automotive repair facility, an implicit acknowledgement that they each held the opinion that the maximally productive use of the subject property was as an automobile service station and automotive repair facility. Had either of the experts considered the maximally productive use of the subject property to be something other than as an automobile service station and automotive repair facility, there would be no point in having

---

[8] For the 2016 tax year the highest and best use of the subject property, as vacant, could not be for use as an automobile service station and automotive repair facility, as this use was not permitted in Fanwood's CC-W - commercial corridor western zoning district.

determined the subject property's value for the 2014 and 2015 tax years under the cost approach based on the replacement of the existing automobile service station and automotive repair facility.[9]

Significantly however, none of the four vacant land sales relied on by Sandberg's expert for the 2014 and 2015 tax years had a highest and best use as an automobile service station, nor permitted use of the property as an automobile service station. Additionally, only one of the four vacant land sales relied on by Sandberg's expert permitted, as a conditional use, an automotive repair facility.

Additionally, none of the seven vacant land sales relied on by Fanwood's expert for the 2014 and 2015 tax years had a highest and best use as an automobile service station. Moreover, it was unclear from the record presented whether operation of an automobile service station and automotive repair facility was a legally permitted use in the zoning districts for each of the seven comparable land sale transactions.[10]

Sandberg's expert's vacant land sale one was located in the B-B professional office zoning district with an intended use as a car wash, a highest a best use different than the subject property. Moreover, an automobile service station and automotive repair facility was not a permitted use in the B-B professional office zone. Sandberg's expert's vacant land sale two was located in the LI light industrial zoning district with a proposed use as an industrial building, a

---

[9] As stated above, because the subject property's zoning changed for the 2016 tax year and use of the subject property as an automobile service station and automobile repair facility became a legally permitted, non-conforming, pre-existing use, it would have been possible to use comparable land sales for the 2016 tax year with a highest and best use different than as an automobile service station and automotive repair facility.

[10] Fanwood's expert offered some testimony during cross-examination that he believed vacant land sale one permitted use as a convenience store and automobile service station.

highest a best use different than the subject property. Moreover, an automobile service station was not a permitted use in the LI zoning district.[11] Sandberg's expert's vacant land sale three was located in a M-I light industrial zoning district with a proposed use as an industrial/warehouse building, a highest a best use different than the subject property. Moreover, an automobile service station and automotive repair facility was not a permitted use in the M-I zoning district. Sandberg's expert's vacant land sale four was located in the NC neighborhood commercial district with a proposed use for a retail building, a highest and best use different than the subject property. Moreover, an automobile service station and automotive repair facility was not a permitted use in the NC zoning district.

Fanwood's expert's vacant land sale one, two, four, five, six, and seven, consisted of automobile service station sites that were purchased for the purpose of demolishing the existing automobile service station, and constructing new improvements with a different highest and best use.[12] Specifically, Fanwood's expert's vacant land sale one was a former automobile service station "sold with approvals in place to construct a 7-11" convenience store. Fanwood's expert's vacant land sale two consisted of a former automobile service station that was "sold with approvals in place to construct a Walgreens Pharmacy and a Northfield Bank branch." Fanwood's expert's vacant land sale four and six were the sites of former automobile service stations sold with apparently no approvals in place. Fanwood's expert's vacant land sale five,

---

[11]   According to Sandberg's expert, an automobile service station was not a permitted use, however an automotive repair facility was a permitted use.

[12]   Cross-examination revealed that the deed for vacant land sale one contained a covenant prohibiting use of the property as an automobile service station, gasoline station, car wash, or automobile repair shop. Additionally, cross-examination revealed that vacant land sale two was an assemblage of two properties. The deed price for Block 1409, Lot 15 was $1,200,000, and the deed price for Block 1409, Lot 16 was $500,000, for a total consideration of $1,700,000, and not the $2,300,000 reported by Fanwood's expert.

was a former automobile service station "sold with approvals in place to construct a mixed-use retail/office building." Fanwood's expert's vacant land sale seven was a former automobile service station "sold with approvals in place to construct a 7-11" convenience store. In addition, Fanwood's expert's vacant land sale three was improved with a florist/greenhouse structure at the time of its sale and was sold subject to obtaining approvals for a mixed-use of retail, commercial and residential occupants.

In sum, none of the vacant land sales relied on by Sandberg's expert or Fanwood's expert for the 2014 and 2015 tax years, possessed a highest and best use, as an automobile service station, which represented the highest and best use seemingly adopted by Sandberg's expert and Fanwood's expert.[13] Accordingly, because all of the vacant land sales relied on by Sandberg's expert and Fanwood's expert for the 2014 and 2015 tax years reflected a highest and best use different than that expressed by the experts as the subject property's highest and best use, the court must reject the experts' vacant land sales as being not comparable to the subject property, and not representative of the subject property's land value for the 2014 and 2015 tax years.

b. Adjustments

At the outset the court emphasizes that the adjustments applied by both Sandberg's expert and Fanwood's expert under the cost, sales comparison, and income capitalization approaches suffer from material flaws rendering their opinions of value derived therefrom not credible.

As stated above, Sandberg's expert's relied on four vacant land sale transactions that took place between May 2011 and January 2014. Two were located in Union County, one was

---

[13] The zoning district for Sandberg's expert's comparable land sale three permitted an automotive repair garage as a conditional use. However, the expert was unsure whether the property satisfied the municipality's conditional use standards.

located in Somerset County, and one was located in Middlesex County. Sandberg's expert deemed each of the four vacant land sales comparable as of all three valuation dates involved herein. Sandberg's expert's vacant land sales range in size from 0.616 acres to 4.429 acres, and in unadjusted sale price of $133,053 to $324,675 per acre.

Sandberg's expert then applied a series of adjustments to the vacant land sales to account for perceived differences in location, lot size, physical characteristics, and environmental condition. In total, Sandberg's expert applied gross adjustments of 35% to 50%, and net adjustments of 0% to -35%. The resulting range of adjusted values were $133,053 to $226,667 per square foot. Sandberg's expert concluded a vacant land value of $200,000 per square foot, and an overall land value of $360,000 ($200,000 x 1.81 acres = $362,000) for the subject property during all tax years at issue.

However, in attempting to explain his size adjustments, Sandberg's expert admitted that, "I do not have a mathematical formula, I try and use break points of where I think the market would dictate that it requires an adjustment." However, no data, information, records, or objective market evidence was set forth either in Sandberg's expert's appraisal report, or in his trial testimony supporting those perceived land size "break points." Additionally, in making his physical characteristic adjustments, Sandberg's expert applied an arbitrary 5% adjustment, per category for corner location, shape, topography, wetlands, frontage, and availability of utilities, without any evidence demonstrating that a 5% adjustment appropriately accounted for each of these conditions. Moreover, Sandberg's expert applied a downward environmental condition adjustment of 25% to each vacant land sale to account for the presence of monitoring wells on the subject property. However, once again, Sandberg's expert offered no objective market data, or support for this 25% downward adjustment. Although he expressed an opinion that the

15

subject property's environmental condition adversely impacted its market value, he offered no tangible evidence that the presence of groundwater monitoring wells negatively impacted market value, or that a 25% downward environmental condition appropriately accounted for this condition. Finally, according to Sandberg's expert, his "location adjustments were not based on the economics of a town, but more on traffic counts." However, Sandberg's expert did not identify the differences in the traffic counts of the properties and did not reproduce copies of any traffic studies in his report. Thus, the court was unable to gauge the basis and accuracy of such adjustments.

Fanwood's expert identified ten vacant land sales he considered reflective of the subject property's land value based on similar uses. The ten transactions took place between July 2009 and December 2015. Eight were located in Union County, one was located in Morris County, and one was located in Somerset County. Fanwood's expert deemed vacant land sales one, two, three, and four comparable to the subject property as of the October 1, 2013 valuation date; vacant land sales four, five, six, and seven comparable to the subject property as of the October 1, 2014 valuation date; and vacant land sales seven, eight, nine, and ten comparable to the subject property as of the October 1, 2015 valuation date. Fanwood's expert's vacant land sales ranged in size from 0.21 acres to 1.69 acres, and in unadjusted sale price of $752,632 to $1,893,939 per acre.

Fanwood's expert then applied a series of adjustments to the vacant land sales to account for perceived differences in market condition, location, lot size, physical characteristics, and zoning. In total, Fanwood's expert applied gross adjustments of 20% to 35%, and net adjustments of -35% to -5%. The resulting range of adjusted values were: (i) $643,500 to $1,044,301 per acre, as of the October 1, 2013 valuation date; (ii) $659,091 to $1,231,060 per

acre, as of the October 1, 2014 valuation date; and (iii) $1,005,861 to $1,420,454 per acre, as of the October 1, 2015 valuation date. Fanwood's expert concluded a vacant land value for the subject property of: (i) $800,000 per acre, as of the October 1, 2013 valuation date; (ii) $810,000 per acre, as of the October 1, 2014 valuation date; and (iii) $1,025,000 per acre, as of the October 1, 2015 valuation date.

According to Fanwood's expert he applied a -5% market condition adjustment to vacant land sales one, two, and three, because "it is my opinion that the real estate market was declining from 2007 through 2011. . . [and] I used -5% adjustment for comparables one, two, and three to address the declining real estate market." The court readily acknowledges that beginning in late 2007, and with the collapse of Lehman Brothers in mid-September 2008, our national economy began to suffer through one of "the worst recession[s] since the Great Depression." Marina Dist. Development Co., LLC v. City of Atlantic City, 27 N.J. Tax 469, 481 (Tax 2013). However, the court's familiarity or general knowledge of these national economic conditions does not enable it to precisely gauge how the sale prices of these allegedly comparable properties were impacted. For instance, does a -5% adjustment appropriately account for how the recession impacted or influenced the value of the vacant land sales in 2009 in comparison to 2014, or is an adjustment of -10% or -15% more representative of how the recession impacted their values? Without a comparison and analysis of sales of similarly situated properties in the marketplace during the time periods at issue, it is impossible for the court to determine the reasonableness of the expert's adjustment.

In addition, Fanwood's expert offered testimony that "with each adjustment I make it's in 5% increments for location, lot size, physical and zoning." However, Fanwood's expert's location adjustments were seemingly based solely on his subjective opinions, and lacked any

market derived support. Additionally, Fanwood's expert's zoning adjustments were apparently intended to "take[] into consideration what would be a permitted use . . . and what may or may not need a variance or alternate use, or other types of influences within the zoning." However, such adjustments were again based on his subjective opinions of what was a "superior" and inferior zoning district and were not supported by any empirical data or evidence that properties sold in specific zoning districts generate a higher return, or evidence that the adjustment was based on some formula related to the costs that would be incurred in obtaining a variance. Moreover, Fanwood's expert's physical adjustments were intended to account for differences in "physical characteristics of the subject property," such as corner location, topography, and excessive demolition costs. However, Fanwood's expert offered no data or market support for his adjustment amounts. While the units of comparison may bear some association to the wide-range of comparable land sale prices (unadjusted from $17.33 psf to $44.09 psf), Fanwood's expert failed to offer any objective market data that the adjustment amounts properly and accurately accounted for the units of comparison selected.

In sum, Sandberg's expert's adjustments to his four vacant land sales, and Fanwood's expert's adjustments to his ten vacant land sales, for market conditions, location, lot size, physical characteristics, environmental conditions, and zoning, were not adequately supported by empirical or objective market data in the experts' appraisal reports or in the trial record before the court.

It is well-settled that an appraiser's opinion of the market value of a property can only be supported by "studying the market's reaction to comparable and competitive properties." The Appraisal of Real Estate, at 377. By definition, comparability does not require properties to be identical, as "differences between a comparable property and the subject property are anticipated.

Such differences are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987).

However, the weight to be accorded expert testimony hinges "upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980). Thus, in order for the opinion of an expert to be of any import, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. 'Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard.'" Greenblatt, 26 N.J. Tax at 55 (quoting Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980)). If the expert's opinion lacks a reliable foundation, supported by facts and objective market data, "the court cannot extrapolate value." Inmar Associates, 2 N.J. Tax at 66.

In sum, for the 2014, 2015, and 2016 tax years, neither Sandberg's expert, nor Fanwood's expert offered credible objective market data, information, research, or evidence supporting their adjustments for market conditions, location, lot size, physical characteristics, environmental condition, and zoning. Thus, for the above-stated reasons, the court must reject the experts' vacant land sales for the 2014, 2015, and 2016 tax years.

Accordingly, because the court lacks adequate credible market evidence of the subject property's land value as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation

dates, the court must reject the experts' cost approach, and need not address the replacement cost for the subject property's buildings and improvements derived by the experts.

2. <u>Sandberg's expert's improved sales comparison approach</u>

As stated above, the sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." <u>The Appraisal of Real Estate</u>, at 377. The sales comparison approach requires an appraiser to investigate and analyze trends in the marketplace, to derive a credible opinion of value. The appraiser must engage in a "comparative analysis of properties" and focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." <u>Id.</u> at 378. When credible and reliable market data is available, the sales comparison approach "is the most straight forward and simple way to explain and support an opinion of market value." <u>Greenblatt</u>, 26 N.J. Tax 41.

Improved comparable sale one was formerly used as an automobile service station and automobile repair facility with two service bays. This sale one was located in the R-4 moderate density residential zoning district, and as such, operation of the property as of the date of sale as an automobile service station and automotive repair facility was a non-conforming use. The site area for comparable sale one was 0.357 acres, or approximately 20% of the site size of the subject property. Additionally, the building was 1,870 square feet, or approximately 33% of the size of the subject property's building. Following the sale, the gasoline pumps and underground storage tanks were removed and the building, including the automotive repair bays, were converted into a convenience store and deli.

20

Improved comparable sale two was an automobile service station and automotive repair facility with a convenience store. The site area for improved comparable sale two was 0.483 acres, or approximately 27% of the site size of the subject property. Additionally, the building was 3,358 square feet, or approximately 58% of the size of the subject property's building. Following the sale, the convenience store was converted into a Subway sandwich shop.

Improved comparable sale three was an automobile service station and automotive repair facility with four service bays and two canopies. The site area for improved comparable sale three was 0.327 acres, or approximately 18% of the site size of the subject property. Additionally, the building was 2,376 square feet, or approximately 41% of the size of the subject property's building. Following the sale, comparable sale three was converted into an automotive repair facility without any gasoline service. Significantly however, Sandberg's expert was unable to verify the terms and conditions of this sale with any party to the transaction.

Improved comparable sale four was an automobile service station and automotive repair facility with three service bays. The site area of improved comparable sale two was 0.340 acres, or approximately 19% of the site size of the subject property. Additionally, the building was 2,650 square feet, or approximately 46% of the size of the subject property's building. According to the expert, the "building and site were renovated and upgraded subsequent to the sale." The property continues to be operated as an automobile service station and automotive repair facility.

When employing the sales comparison approach appraisers must conduct research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold. The Appraisal of Real Estate, at 381. A crucial element of this investigation and research involves the data verification process. An appraiser must verify the

21

integrity of the information by "confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations." Ibid. During the data verification process an appraiser must "elicit additional information about the property such as buyer motivation, economic characteristics, [and] value component allocations . . . to ensure that comparisons are credible." Ibid. The process demands an appraiser "verify information with a party to the transaction to ensure its accuracy and gain insight into the motivation behind each transaction." Id. at 385. An appraiser must endeavor to confirm "statements of fact with the principals to the transaction . . . or with brokers, closing agents, or lenders involved." Ibid.

Moreover, our Legislature has mandated that, in Tax Court proceedings, any person being offered as a witness with respect to the review of a local property tax assessment shall possess information or knowledge regarding comparable properties acquired from owners, sellers, purchasers, lessees, brokers, or attorneys who were a party to, or participated in, the transaction. N.J.S.A. 2A:83-1. Specifically, N.J.S.A. 2A:83-1 requires that:

> in any action or proceeding in the Tax Court, any person offered as a witness in any such action or proceeding shall be competent to testify as to sales of comparable land, including any improvements thereon. . . from information or knowledge of such sales, obtained from the owner, seller, purchaser, lessee or occupant of such comparable land, or from information obtained from the broker or brokers or attorney or attorneys who negotiated or who are familiar with or cognizant of such sales, which testimony when so offered, shall be competent and admissible evidence in any such action or proceeding.
>
> [Id.]

Here, Sandberg's expert's failure to verify the terms of improved comparable sale three with a transaction participant renders improved comparable sale three inherently unreliable as evidence of the subject property's true or market value.

In addition, Sandberg's expert's adjustments to improved comparable sales one, two, and four were not supported by objective data, or tangible market evidence, rendering them unreliable. According to the expert, no location adjustment was deemed necessary because each of the improved sales were located along a "heavily traveled roadway or corner property or something of that nature" and "each property had similar traffic counts." However, the expert did not attach the traffic count studies, nor did he offer any testimony regarding what those traffic count studies revealed, or how they were similar or different than the subject property. Additionally, he offered no testimony or evidence with respect to how the traffic counts directly correlated to the value of an automobile service station.

Moreover, according to Sandberg's expert, he made a negative size adjustment to each of the improved sales to account for the fact that none of them had ten service bays like the subject property. In the expert's opinion, "larger buildings tend to sell at a discount when measured on a per unit basis and vice versa, since the subject property is 5,747 square feet, . . . I applied negative adjustments to each one of the sales, I tried to do a little bit of a break point, you know about 1,000 square feet each try, or 1,500 [square feet]." However, Sandberg's expert offered no data or support for these size adjustments, or evidence that the break points selected accurately reflected a manner to gauge the value of automotive repair facilities.

In order to compute his land to building ratio, Sandberg's expert "used a formula for this, where I . . . went through each sale and determined the land area necessary to equate it to the subject property, [and] I applied our cost approach [land] value of $200,000." However, the credibility and reliability of this adjustment is predicated on the underlying land value being accurate. If the expert's land value is underestimated and a higher land value should have been utilized, then the expert's proposed adjustment percentage amount would correspondingly

23

increase. Here, the court found Sandberg's expert's land value under the cost approach to be unreliable (for the reasons explained above), and not an accurate representation of the subject property's land value, accordingly, the court must similarly reject Sandberg's expert's land to building ratio adjustment.

Finally, according to Sandberg's expert in applying his physical characteristic adjustments "I used items like corner, the service island, pumping stations, the number of bays, retail store and adjusted each based on those factors." However, the expert offered no market data or evidence in support of these adjustments. According to the expert's report, the improved "comparable sales had similar basic layouts and basically similar fueling capacity." Thus, he applied positive physical characteristic "adjustments . . . to Sale Nos. 1, 3 and 4 which has fewer service bays." Yet, the expert applied a negative physical characteristic adjustment, "to Sale No. 2 . . . [because it had] a 2,200 +/- square foot convenience store which could be owner-occupied or leased to a tenant." The adjustments applied by the expert were subjective and speculative and lacked any objective market extracted evidence. The expert offered no evidence that a property possessing a 2,200 square foot convenience store was superior to a property possessing a 4,802 square foot automotive repair facility, or that a -20% adjustment appropriately accounted for those differences or alleged superiority in physical characteristics.

As stated above, the sales comparison approach requires an appraiser to conduct research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold. The Appraisal of Real Estate, at 381. Based on the appraiser's review of that market data, he or she is able to select appropriate units of comparison between the properties. The appraiser can then analyze and compare the units of comparison and extract how certain elements or factors impact or influence a property's value. Thus, the

24

appraiser's opinion of market value is supported by "studying the market's reaction to comparable and competitive properties," and making appropriate adjustments to account for those elements or factors impacting value. Id. at 377. However, when an appraiser fails to provide objective evidence extracted from the market supporting a unit of comparison, the adjustments constitute nothing more than conjecture and hyperbole. The weight to be accorded expert testimony hinges "upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980).

Here, the adjustments applied by Sandberg's expert under his sales comparison approach were subjective, and not supported by objective market data. Simply stated, Sandberg's expert failed to provide the "why and wherefore" in support of his site size, land to building ratio or physical characteristic adjustments. The expert did not identify any studies, surveys, or any objective market data upon which these adjustments were founded. Consequently, without an adequate understanding of the factual underpinnings of the expert's adjustments, the court is unable to conclude that they were reasonable and must reject same. As such, the court concludes that Sandberg' expert's conclusions under the sales comparison approach must be accorded little weight in the determination of the subject property's true market value.

3. Fanwood's expert's income capitalization approach

When a property is income producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996). "The income

capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, 439.

The determination of economic or market rent allows an appraiser to accurately forecast the stream of income to be generated and to convert that future benefit into a present value. Therefore, the first and often most critical step in performing the income capitalization approach is "determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J. at 270; see also New Brunswick, 39 N.J. at 544.

Here, the subject property was not income producing as of the valuation dates. However, in Fanwood's expert's opinion, "this type of property can easily be leased and has a multitude of potential uses, and that the majority of tenants will use the property for various auto related businesses such as auto repair, gasoline, or for parking, for convenience store patrons coming and going. . . ." Thus, in conducting his review, Fanwood's expert examined "any auto-related land leases that would be used for vehicle parking, or as another gas station. . . ."

a. Market Rent

The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, at 121-22.

In determining the subject property's market rent, Fanwood's expert relied on eight land leases entered into between March 2012 and October 2014. The eight land leases relied on by

Fanwood's expert are outlined below.[14]  Fanwood's expert used leases one, two, three, and four to derive a value for the subject property for the 2014 and 2015 tax years; and leases five, six, seven and eight to derive a value for the subject property for the 2016 tax year.

| Land lease | Address | Use | Condition Bldg./Quality | Size | Lease date Lease term | Rent per Sq. Ft. Lease terms |
|---|---|---|---|---|---|---|
| 1 | 75 Old South Ave. Fanwood, NJ Union Co. | 1,560 sq. ft. one-story auto repair facility with vehicle storage | Fair Average | 18,300 sq. ft. 0.42 acres | 10 years month-to-month | $2.50 psf Gross |
| 2 | 457 West End Ave. N. Plainfield, NJ Somerset Co. | Fenced parking area for auto dealership | Land | 43,560 sq. ft. 1 acre | 10/2012 1 year w/renewals | $1.51 psf Triple net |
| 3 | 23 Springfield Ave. Springfield, NJ Union Co. | 7,500 sq. ft. one-story auto repair/body shop facility | Average Average | 44,100 sq. ft. 1.01 acres | 03/2012 | $1.97 psf Triple net |
| 4 | 153 Route 4 West Paramus, NJ Bergen Co. | Exxon gas sta. & 1,104 sq. ft. convenience st. | Average Average | 51,278 sq. ft. 1.18 acres | 05/2012 | $2.57 psf Triple net |
| 5 | 1830 Easton Ave. Franklin Twp., NJ Somerset Co. | Exxon gas sta. with 200 sq. ft. kiosk | Average Good | 71,438 sq. ft. 1.64 acres | 03/2014 | $4.75 psf Triple net |
| 6 | Rte. 1 & 9 Newark, NJ Essex Co. | 2,000 sq. ft. Alamo car rental | Average Good | 40,215 sq. ft. 0.92 acres | 10/2014 | $3.74 psf Triple net |
| 7 | 2 South Ave. Fanwood, NJ Union Co. | Proposed CVS pharmacy | Land | 87,724 sq. ft. 2.01 acres | 11/2014 | $3.70 psf Triple net |
| 8 | 379 Rte 28 West Bridgewater, NJ Somerset Co. | 2,880 sq. ft. garage with landscaping vehicle parking | Fair Fair | 43,560 sq. ft. 1 acre | 10/2014 | $1.58 psf Gross |

Fanwood's expert then applied adjustments to each of the land leases to account for perceived differences in: lease type, location, lot size, and physical conditions.

As of the October 1, 2013 and October 1, 2014 valuation dates Fanwood's expert applied the following adjustments: (1) land lease one was adjusted downward $0.80 psf for lease type as it was a gross lease, upward 5% for location, downward 10% for unit size, and upward 20% for

_____

[14]  Land lease 7 was a land lease entered into for the subject property to erect a CVS pharmacy. However, the land lease was subject to obtaining site plan approval for a CVS pharmacy and another building, which approvals were not obtained.

physical characteristics, resulting in an adjusted rental rate of $2.04 psf; and (2) land lease two was adjusted downward 5% for unit size, and upward 25% for physical characteristics, resulting in an adjusted rental rate of $1.81 psf; (3) land lease three was adjusted downward 5% for location, downward 5% for unit size, and upward 10% for physical characteristics, resulting in an adjusted rental rate of $1.97 psf; and (4) land lease four was adjusted downward 5% for location, and downward 5% for unit size, resulting in an adjusted rental rate of $2.31 psf.

As of the October 1, 2015 valuation date Fanwood's expert applied the following adjustments: (1) land lease five was adjusted downward 10% for location, resulting in an adjusted rental rate of $4.27 psf; and (2) land lease six was adjusted downward 20% for location and downward 5% for unit size, resulting in an adjusted rental rate of $2.80 psf; (3) land lease seven was adjusted downward 10% for lease type, downward 30% for physical characteristics, resulting in an adjusted rental rate of $2.33 psf; and (4) land lease eight was adjusted downward -$0.25 psf for lease type as it was a gross lease, upward 10% for location, and upward 20% for physical characteristics, resulting in an adjusted rental rate of $1.73 psf.

Ultimately, Fanwood's expert concluded a market rental rate for the subject property of: (1) $2.00 psf, triple net, as of the October 1, 2013 and October 1, 2014 valuation dates; and $2.25 psf, triple net, as of the October 1, 2015 valuation date.

However, as addressed above, Fanwood's expert's adjustments lacked any objective support derived from data extracted from the market. Instead, the adjustments were based on Fanwood's expert's subjective opinions for lease type, location, unit size, and physical conditions. No testimony or evidence is contained in the expert's appraisal report or in the trial record in support of the -$0.80 psf or -$0.25 psf adjustment for lease type. Additionally, Fanwood's expert's location adjustments were similarly unsupported by any objective market

derived data. For instance, Fanwood's expert applied a downward 5% adjustment to land lease four, an automobile service station located at 153 Route 4 West, Paramus, New Jersey. However, Fanwood's expert offered no testimony that he performed a paired analysis of similarly situated land leased properties along South Avenue in Fanwood and along Route 4 West in Paramus to discern that a downward 5% adjustment appropriately accounted for the locational rental value differences between the two properties. During cross-examination the expert offered only that his location adjustments were based on his knowledge and experience in the profession. However, without offering insight and an analysis of land leases of similarly situated properties in the marketplace, it is impossible for the court to determine the reasonableness of the expert's location adjustments. Further, the expert's physical condition adjustments were unsupported in the report. The expert applied a downward physical condition adjustment of 30% to land lease seven, the executed land lease for the subject property, which lease was subject to obtaining site plan approval to construct a CVS pharmacy. In the expert's opinion, the downward 30% adjustment was intended to account for items such as physical appeal and "buildings to be removed." However, the expert offered no evidence either in his appraisal report or in his trial testimony regarding the estimated costs to demolish the existing improvements, or that a downward 30% adjustment appropriately accounted for the costs associated with obtaining site plan approval and demolishing the existing improvements on the subject property. Finally, the expert's lot size adjustments were similarly unsupported with objective market extracted data. According to the expert, his lot size adjustments were based on economies of scale, the general principle that a smaller property will lease for more per square foot than a larger property. However, the expert offered no evidence of paired land leases in the marketplace.

Here, the adjustments applied by Fanwood's expert to the land leases under his income capitalization approach to discern market rent were subjective, and not supported by objective market data. Fanwood's expert simply failed to provide the "why and wherefore" in support of his lease type, location, lot size, and physical condition adjustments. The expert did not identify any studies, surveys, or any objective market data upon which his adjustments were founded. Consequently, without an adequate understanding of the factual underpinnings of the expert's adjustments, the court is unable to conclude that they were reasonable and must reject same. As such, the court concludes that Fanwood's expert's conclusions under the income capitalization approach must be accorded little weight in the determination of the subject property's true or market value.

C. The Glen Wall dilemma

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall. Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax, 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record.

Here, the court's review and analysis of the experts' vacant land sales, improved comparable sales, and land leases disclosed a wide-range of property values. As recited above, the unadjusted vacant land sales range in value from $133,053 to $1,893,939 per acre. Additionally, Sandberg's expert's unadjusted improved comparable sales range in value from $189.39 to $296.31 per square foot. Finally, Fanwood's expert's unadjusted land leases range in value from $1.51 to $4.75 per square foot for triple net leases, and $1.58 to $2.50 per square foot

for gross leases. However, without appropriate units of comparison supported by objective, market extracted data, the court is unable to discern the appropriate adjustments to apply to each vacant land sale, improved comparable sale, and land lease to produce a credible estimate of the subject property's value.

The court's independent determination of value must be based "on the evidence before it and the data that are properly at its disposal." F.M.C. Stores Co. v. Morris Plains Borough, 100 N.J. 418, 430 (1985). Here, the court concludes that the experts' appraisal reports and the trial record contains insufficient information to enable the court to make a credible and reliable independent finding regarding the adjustments to be made to the vacant land sales, improved sales, and land leases as of the October 1, 2013, October 1, 2014, and October 1, 2015 valuation dates. Accordingly, as a result of the above stated inadequacies, insufficient credible evidence exists for this court to make an independent determination of the true market value of the subject property by a fair preponderance of the evidence.

Accordingly, the court will enter judgments affirming the subject property's 2014, 2015 and 2016 local property tax assessments.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.

31